T.C. Memo. 2007-5

UNITED STATES TAX COURT

RICHARD NICHOLS AND LISA NICHOLS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1384-05L.                    Filed January 9, 2007.

<u>David B. Shiner</u>, for petitioners.

<u>Gregory J. Stull</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>: In 2001, Richard Nichols and his wife Lisa reached a compromise with the IRS on their 1994 tax liability. The Nicholses agreed that the IRS could immediately assess and collect an agreed amount, but they reserved the right to sue for a refund. The Nicholses then learned that they had net operating losses from later years. They asked the Commissioner to let them use these losses to reduce their 1994 tax liability; they also

asked for a partial abatement of interest.  The Commissioner took the position that a deal's a deal, and moved to collect the unpaid 1994 tax.

There are only two issues for us to decide: (1) may the Nicholses use the net operating losses to fend off the Commissioner's collection effort?; and (2) are they entitled to an abatement of interest?  The Commissioner has moved for summary judgment on both.

<u>Background</u>

This case began with the Commissioner's audit of the Nicholses' 1994 tax return.  The audit was prolonged, but in May 2001 the parties finally negotiated a compromise and executed a standard IRS Form 870, entitled "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment."  As the name states, a taxpayer who signs this form waives any restrictions on assessment of a disputed tax by the Commissioner.  Waiving restrictions on assessment may seem a minor detail--assessment is little more than a recording of a tax liability in the IRS's records, sec. 6203,[1] but it is an important milestone in tax procedure because, once the IRS assesses a liability, it can then begin to try to collect.

Signing a Form 870 and agreeing to immediate assessment and

---

[1] All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

collection of a specific deficiency is not the same as agreeing that the deficiency agreed to is accurate. A taxpayer who signs the form may later claim a refund after paying. But he gives up the right to come to Tax Court: "If you later file a claim and the Service disallows it, you may file suit for refund in a district court or in the United States Claims Court, but you may not file a petition with the United States Tax Court." Just to make sure that point is clear, the form also states--directly above the signature line--"I understand that by signing this waiver, I will not be able to contest these years in the United States Tax Court, unless additional deficiencies are determined for these years."

The Commissioner assessed the tax as agreed, but the Nicholses never paid because they learned later in 2001 that one of their businesses had produced net operating losses (NOLs) for the tax years 1995 and 1997. This spurred them to file an amended 1994 tax return (Form 1040X) in December 2002, claiming these NOLs as deductions that they could carry back to the 1994 tax year. The IRS treated their 1040X as a refund claim and rejected it as untimely.[2] The filing and rejection of a Form 1040X is often the prelude to a refund action, but the Nicholses

---

[2] The rejection letter stated that no credit or refund would be allowed for a claim filed more than three years after the due date of the returns which established the NOLs; i.e., the 1995 and 1997 tax returns.

never filed one. With no voluntary payment in sight, the Commissioner sent a collection due process (CDP) notice in February 2003, which warned the Nicholses that he intended to levy their property to collect the still unpaid 1994 taxes. The Nicholses did not request a CDP hearing after getting the notice, but instead sent a letter in March requesting reconsideration of the IRS's decision to deny them the benefit of the NOLs that they had claimed on their 1040X.[3]

In April 2003, the IRS sent the Nicholses a CDP notice of the filing of a federal tax lien. This time, the Nicholses did request a CDP hearing, arguing that the filing of a lien was premature as there were still "significant issues that remain unresolved." Foremost among these open issues was their March 2003 request to the IRS that it reconsider its decision denying them the NOL carrybacks. Their CDP request also mentioned that they planned to seek an abatement of interest, though they didn't actually ask for one in their CDP request.[4]

---

[3] At about the same time, they also sent a letter to the IRS asking for an installment payment plan, conditioned on a reduction in the 1994 deficiency. However, at that time they had not filed a tax return for any tax year after 1997, and the Commissioner will not consider giving installment agreements to taxpayers who are not current in their filing obligations. See Orum v. Commissioner, 412 F.3d 819, 820 (7th Cir. 2005), affg. 123 T.C. 1 (2004); Internal Revenue Manual sec. 5.14.1.5.1(4) and (5).

[4] The Nicholses raised several other procedural arguments in their CDP request which they have since conceded.

The Nicholses finally requested interest abatement on October 31, 2003, in a letter sent to an IRS agent not involved in the CDP process. In that letter, they asked for an abatement of 75% of the accrued interest because of "numerous lengthy spans of time during which the files just sat on the respective personnel's desks." They also claimed that the initial audit took six years to complete and that this was an unreasonable amount of time. The letter didn't offer any other reasons for the interest abatement, nor did it explain why they decided to ask for an abatement of only 75 percent of the interest charged. The first IRS agent to consider the matter denied the request quickly, but the Nicholses asked the IRS Appeals Office to review that denial, arguing that the acts complained of were "managerial" under section 301.6404-2 of the Procedure and Administration Regulations. The Appeals Office has not yet held a conference to consider their request.

Although the Nicholses had not listed either the NOL carryback or the interest abatement issues as reasons to release the lien, the Appeals officer who held the CDP hearing considered the NOL carryback issue and noted in the record that the Nicholses were pursuing interest abatement. In June 2004, that officer tentatively agreed with the Nicholses to allow all the NOLs. In a letter confirming their understanding of this agreement, the Nicholses also asked him to abate all interest and

penalties "to expedite the closure of the 1994 tax year." All this fell through, though, when the Appeals team manager looked at the arrangement and nixed both the tentative settlement and the Nicholses' plea for interest abatement.

In October 2004, the Appeals officer faxed a draft version of the notice of determination to the Nicholses at their request. This draft included the NOLs as a separate issue "raised by the taxpayer" and concluded that the 1994 Form 1040X needed to be directed to a different division within the IRS if it was to lead to a reconsideration of the 1994 tax liability. The final notice of determination, issued on December 22, 2004, no longer included the NOLs as a separate issue, noting them only as part of a collection alternative offered by the Nicholses--one which "may be considered by other functions within the Service." (This may refer to the IRS's audit reconsideration group.) The Nicholses filed a timely petition to review this final notice of determination, and the Commissioner has now moved for summary judgment. The Nicholses were Illinois residents when they filed their petition, and we put the case on a Chicago trial calendar.

## Discussion

Summary judgment is appropriate where it is shown that "there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). If there

are any factual inferences to be made, we make them in favor of the party opposing summary judgment--in this case, the Nicholses. See <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). The Nicholses may not, however, rest on their pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Rule 121(d); <u>Dahlstrom v. Commissioner</u>, 85 T.C. 812, 820-21 (1985).

A.    <u>Challenge to Deficiency</u>

The first issue is whether the Nicholses can apply their NOLs to reduce the tax liability that they agreed the Commissioner could assess when they signed the Form 870. If this case was one under section 6213(a) to redetermine a deficiency, the answer would be easy: The Supreme Court itself has ruled that a waiver of assessment, signed before the Commissioner sends a notice of deficiency, is fully effective and allows the Commissioner to begin collection immediately after assessment. See <u>United States v. Price</u>, 361 U.S. 304, 313 (1960). Courts uniformly understand that signing a Form 870 means giving up the right to come to Tax Court with a deficiency suit. See <u>Smith v. United States</u>, 328 F.3d 760, 766-767 (5th Cir. 2003); <u>Phila. & Reading Corp. v. United States</u>, 944 F.2d 1063, 1067 (3d Cir. 1991); <u>Kalil v. Enochs</u>, 295 F.2d 467, 469 (5th Cir. 1961) (and cases cited there); <u>Webster v. Commissioner</u>, T.C. Memo. 1992-538.

The Nicholses claim that they are not trying to rewrite the

deal they made but only apply additional deductions to the agreed upon deficiency. To support their argument, they rely on Urbano v. Commissioner, 122 T.C. 384, 392 (2004), where we held that the parties' agreement that a particular amount could be assessed did not bar us from reviewing that amount when the reason for review was not part of the original agreement and was unknown by either party at the time the agreement was signed. The Nicholses claim that their situation is just like the one in Urbano because their NOLs weren't included in the Form 870 and neither party knew of their availability when they signed the form.

The problem with this argument is that Urbano featured a different IRS form, Form 4549-CG. Id. at 387. The consent-to-assessment language on a Form 4549-CG states: "I do not wish to * * * contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties * * * ." This waiver, which extends only to "the findings in this report," is plainly more limited than the waiver on a Form 870. And in Urbano, we heard the taxpayers' challenge to the amount of interest that they owed because the "findings" reported on the Form 4549-CG did not include a finding on that issue. Id. at 392. A Form 870 has a different purpose--it memorializes an agreement that the Commissioner can assess a particular amount of tax. Someone signing a Form 870 is not even agreeing that he

owes the extra tax--only that the Commissioner can assess and collect it, leaving him with the right to sue for a refund. Likewise, from the Commissioner's perspective, signing a Form 870 isn't his agreement that no more extra tax might be owed; the "General Information" section of Form 870 states: "[Your consent] will not prevent us from later determining, if necessary, that you owe additional tax * * *."

But the Nicholses have another argument. They contend that, even if the Form 870 would bar them from opening the front door to Tax Court to challenge the deficiency assessed against them, they can still sneak in the back door by challenging the Commissioner's decision to try to collect on the assessment because they never got a notice of deficiency. And section 6330(c)(2)(B) gives their argument a superficial plausibility-- that section allows taxpayers to challenge their underlying tax liability if they "did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute such tax liability."

The Nicholses, it is undisputed, did not receive a notice of deficiency. But of course the reason they didn't receive one is that they voluntarily waived their right to do so when they signed the Form 870. We have held that section 6330 "provides no consolation to petitioners who themselves made the choice not to receive * * * [a notice of deficiency]." Aquirre v.

<u>Commissioner</u>, 117 T.C. 324, 327 (2001); see also <u>Deutsch v. Commissioner</u>, T.C. Memo. 2006-27. And that's just the choice the Nicholses made.

The Nicholses' claim must also fail for a second reason. Before the Commissioner tried collecting the disputed 1994 liability via a lien under section 6320, he had sent them a CDP notice saying that he intended to collect via a levy under section 6330. Even if the Nicholses hadn't signed the Form 870, failing to request a CDP hearing after getting a notice of intent to levy would bar them from contesting their tax liability. The regulation states:

> Where the taxpayer previously received a CDP Notice under section 6330 with respect to the same tax and tax period and did not request a CDP hearing with respect to that earlier CDP Notice, the taxpayer already had an opportunity to dispute the existence or amount of the underlying tax liability.

Sec. 301.6320-1(e)(3), A-E7, Proced. & Admin. Regs; see also <u>Bell v. Commissioner</u>, 126 T.C. 356, 358 (2006); <u>Mays v. Commissioner</u>, T.C. Memo. 2006-197.

The Nicholses finally argue that the Commissioner forfeited the right to invoke the above regulation--section 301.6320-1(e)(3), A-E7, Proced. & Admin. Regs.--when he actually considered the NOLs during their later CDP hearing. See sec. 301.6320-1(f)(2), A-F5, Proced. & Admin. Regs. (allowing Tax Court review of any issue raised in the taxpayer's CDP hearing).

This argument hearkens to the liberal rules of pleading that treat issues actually tried as if they had been raised in the pleadings. See Rule 41(b)(1); Fed. R. Civ. P. 15(b). And the Nicholses might even be able to tease such an argument out of the regulations themselves. Consider the regulation as it stood when they had their hearing:

> In seeking Tax Court or district court review of Appeals' Notice of Determination, the taxpayer can only request that the court consider *an issue that was raised* in the taxpayer's CDP hearing.

Sec. 301.6320-1(f)(2), A-F5, Proced. & Admin. Regs. (as amended in 2002) (emphasis added). And compare it to the recent revision:

> In seeking Tax Court review of a Notice of Determination, the taxpayer can only ask the court to consider an issue, including a challenge to the underlying tax liability, that was *properly* raised in the taxpayer's CDP hearing.

Sec. 301.6320-1(f)(2), A-F3, Proced. & Admin. Regs. (effective Nov. 16, 2006) (emphasis added).

The problem with this reasoning is that the revised regulation states existing law; it doesn't change it. We had already held before this revision that the Code itself limits the power of the Commissioner (and on appeal, us) to reconsider liability issues. *De novo* review such as the Nicholses are requesting is appropriate only "[w]here the validity of the tax liability was properly at issue in the hearing * * *." H. Conf.

Rept. 105-599, at 266 (1998), 1998-3 C.B. 770, 1020; see Sego v. Commissioner, 114 T.C. at 609-610 (2000). Because they gave up their right to come to Tax Court to redetermine their deficiency before collection, they can't successfully complain when the Commissioner tries to collect.

B. Abatement of Interest

The Nicholses also ask us to review their request for interest abatement, either as a direct appeal of the Commissioner's denial of their request under section 6404 or as part of their CDP hearing under section 6320. Under either theory, we must decide whether the Commissioner abused his discretion. Sec. 6404(h)(1); Sego, 114 T.C. at 609-610.

Direct review under section 6404(h)(1) requires a taxpayer to petition this Court within 180 days of the Secretary's final determination not to abate interest. The problem for the Nicholses is that the Secretary has not yet issued a final determination. The first request for interest abatement, which the Nicholses included in a letter dated October 31, 2003, was denied on November 20, 2003. The Nicholses then filed an appeal with the IRS in December 2003, but that appeal has not yet run its course. Even if we treat the initial rejection as a final determination, they did not meet the Code's 180-day deadline. We thus have no independent jurisdiction under section 6404.

We may, however, have jurisdiction under section 6320. In

Katz v. Commissioner, 115 T.C. 329, 340-341 (2000), we held that we have jurisdiction to review the Commissioner's determination not to abate interest that is the subject of his collection effort. That we have jurisdiction to review the Commissioner's refusal to abate interest after a CDP hearing doesn't relieve taxpayers from the usual requirement that they raise the issue. Sec. 301.6320-1(f)(2), A-F5, Proced. & Admin. Regs. (as amended in 2002); see Magana v. Commissioner, 118 T.C. 488, 493 (2002) (only issues raised during the CDP hearing or otherwise brought to the Appeals Office's attention generally considered on review). The Nicholses claim they raised interest abatement as an issue, the Commissioner claims they didn't, and the record doesn't provide a clear indication either way. Because this is the Commissioner's summary judgment motion, we assume that the Nicholses properly raised the issue, and ask whether the Commissioner has shown that there is no genuine dispute that his refusal to abate interest was an abuse of discretion. Rule 121.

We begin with the Code: Section 6404(e)(1) states that interest may be abated for "any deficiency attributable * * * to any error or delay by an officer or employee of the Internal Revenue Service * * * in performing a ministerial act," though only when "no significant aspect of such error or delay can be attributed to the taxpayer * * *." Sec. 6404(e).[5]

_____

[5] Section 6404(e) was amended in 1996 to allow relief from
(continued...)

Regulations define "ministerial act" as "a procedural or mechanical act that does not involve the exercise of judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place." Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987). The regulations illustrate how the Commissioner applies this definition with numerous examples. See sec. 301.6404-2T(b)(2), Temporary Proced. & Admin. Regs., supra. A consistent theme in the examples is that decisions on allocating IRS personnel are "managerial," not "ministerial," meaning that delays caused by the Nicholses' file sitting "on the respective personnel's desk"--even if we assume on a summary judgment motion that those delays are completely the IRS's fault--from the onset of the audit until the execution of the Form 870 are not ministerial. This is not new--we have held in the past that the "mere passage of time" does not "establish error or delay * * * in performing a ministerial act." Lee v. Commissioner, 113 T.C. 145, 150 (1999). And, as the Commissioner argues, once the Form 870 was signed, the Nicholses themselves were directly responsible for the interest accrual by choosing not to pay the

---

[5](...continued)
interest that piled up because of "managerial acts" by the IRS, but that amendment is effective only for tax years beginning after July 30, 1996. Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 301(a)(2), 110 Stat. 1457.

tax liability they agreed to or at least posting a bond or remitting a deposit.  See <u>Chan v. Commissioner</u>, T.C. Memo. 2001-268.  We therefore conclude that the Commissioner did not abuse his discretion by refusing to abate the interest that the Nicholses owe.

Summary judgment for the Commissioner being appropriate on both of the issues before us,

<u>An order and decision in favor of respondent will be entered</u>.